UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN THE MATTER OF                    )
                                    )    00-2692
GENESIS HEALTH VENTURES,            )
INC., ET AL.,                       )
                                    )    Camden, New Jersey
                    Debtor.         )    May 13, 2004
                                    )


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            RUSSELL C. SILBERGLIED, ESQUIRE
                            Richards, Layton & Finger
                            One Rodney Square
                            Wilmington, Delaware   19899


For Shareholders:           JAMES J. HAYES
                            4024 Estabrook Drive
                            Annandale, Virginia   22003


Audio Operator:             NORMA SADER

Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P. O. Box 129
                            Gibbsboro, New Jersey   08026
                            Off: (856) 435-7172
                            Fax: (856) 435-7124
                            E-mail: dianadoman@comcast.net




Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

ARGUMENT:

By:  Mr. Silberglied        3, 14

By:  Mr. Hayes              6


THE COURT:

Statements                  20

Ruling                      23

Silberglied - Argument                                    3

1        THE COURT:  Please be seated.  Good morning.

2        MR. SILBERGLIED:  Good morning, Your Honor.

3        THE COURT:  On Genesis, may I have an appearance,

4    please.

5        MR. SILBERGLIED:  Yes.  For the record, Your Honor,

6    Russ Silberglied of Richards, Layton & Finger.  Your Honor, on

7    the agenda, there are only three items today.  And, the first

8    one listed on the agenda is listed as continued.  This is the

9    motion to vacate the automatic stay for a client -- for a

10   creditor named Windle (phonetic).  And, Windle has asked for

11   another continuance.  We might be able stipulate to this.

12   We're looking with -- looking at the issues with them.

13       THE COURT:  Let's hope so.

14       MR. SILBERGLIED:  Items number 2 and 3 are going

15   forward.  I don't know if Your Honor would rather hear number 3

16   first because it's unopposed, as opposed to number 2 which is

17   contested.

18       THE COURT:  That's fine.  We can do that.

19       MR. SILBERGLIED:  Item number 3 is the seventh

20   omnibus claims objection motion as it relates to the remaining

21   outstanding claims.  It was supposed to go forward today with

22   respect to both of the remaining outstanding creditors, which

23   were different departments of the State of New Jersey and

24   different departments in the Federal Government, mostly the

25   IRS.

Silberglied - Argument                          4

1          I understand from chambers that the IRS called

2     chambers and said that the attorney for the IRS had a death in

3     the family and, therefore, requested a continuance which, of

4     course, we're amenable to. We are actually hopeful -- we

5     actually had thought we had worked out everything with the IRS.

6     So, we were somewhat surprised they even wanted to be here.

7     But, be that as it may, hopefully we can just get it done and

8     perhaps we can even do it by certification of counsel and a

9     form of order rather than having to go to another hearing.

10         But, with respect to the State of New Jersey, we have

11    worked out just about everything. And, perhaps the easiest

12    thing is if I can hand up a form of order that really

13    summarizes it.

14         THE COURT:  That's fine.

15         MR. SILBERGLIED:  Thank you, Your Honor. Your Honor,

16    there's been extensive reconciliations between the tax

17    department at Genesis and the various departments of New

18    Jersey, and those reconciliations and negotiations have been

19    fruitful. And, as you will see in number one of the order, we

20    have listed claims A through P, various claims numbers of

21    different divisions of New Jersey that these are all New Jersey

22    agreeing to the -- to allow us to proceed with the objection as

23    unopposed.

24         In certain of them, I think the -- they agree that

25    they taxes were paid. In others, they agreed that the taxes

Silberglied - Argument                    5

1    were -- you know, were reconciled as being different, and so on

2    and so forth.  But, in each instance in A through P, there has

3    been an agreement among the parties.

4               THE COURT:  Okay.

5               MR. SILBERGLIED:  With respect to item number 2,

6    claim number 549, this was a post-petition claim that was filed

7    as a pre-petition claim.  And, so the proposal is simply to

8    have it listed for completeness purposes as disallowed as an

9    unsecured claim with specific language that says this is

10   without prejudice to its treatment as a post-petition claim.

11              THE COURT:  Okay.

12              MR. SILBERGLIED:  And, item number 3 is also a

13   consensual change.  And, the only reason why it's not listed in

14   number 1 is because it's not being disallowed in its entirety

15   by agreement, but rather it's being reduced and allowed by

16   agreement of the parties.  Claim number 932 reduced to the

17   amount of 14,744.89 and allowed.

18              THE COURT:  Very good.  The order has been entered.

19              MR. SILBERGLIED:  Thank you, Your Honor.

20              THE COURT:  Thank you.  And, I take it that the -- we

21   do have another -- the next omnibus hearing scheduled?

22              MR. SILBERGLIED:  I believe we do not.  But, I

23   believe that Multicare has asked for a June 8 omnibus hearing.

24   So, perhaps it just makes sense to have Genesis and Multicare

25   on the same day

Hayes - Argument                    6

1    THE COURT: That's fine. I already have it on, but

2    we'll certainly assign it that day --

3    MR. SILBERGLIED: Your Honor, is --

4    THE COURT: -- at 2:00.

5    MR. SILBERGLIED: 2:00. Thank you. That brings us

6    to Mr. Hayes' motion for the appointment of an equity

7    committee. And, since it's his motion, I'll cede the podium.

8    THE COURT: Okay. Mr. Hayes? Good morning.

9    MR. HAYES: Good morning, Your Honor. I don't have

10   anything to add to any of my motions.

11   THE COURT: Let me perhaps ask you some questions to

12   clarify the procedural posture. I'll note that you filed this

13   motion way back when, September of 2001, I believe, after the

14   confirmation order -- the first motion was filed in August,

15   perhaps, 2001, and, that was rejected in the opinion approving

16   confirmation, is that correct?

17   MR. HAYES: Yes, Your Honor.

18   THE COURT: And, you followed that up --

19   MR. HAYES: I actually filed -- the first request was

20   with the U.S. Trustee.

21   THE COURT: Yes.

22   MR. HAYES: And, he rejected it. And, then I filed

23   it with the Court.

24   THE COURT: That's noted. And, then after the

25   opinion was issued and the order entered, you asked again --

Hayes - Argument                          7

1            MR. HAYES:  Yes.

2            THE COURT:  -- for a committee to be appointed, is

3      that correct?

4            MR. HAYES:  Yes, Your Honor.

5            THE COURT:  And, that's the -- and, that was back in

6      September or early October of -- let's see, I did make note of

7      it.

8            MR. HAYES:  Of 2001.

9            THE COURT:  Of 2001, yes, back -- October 1st, 2001

10     was the date that was noted on your motion papers, correct?

11           MR. HAYES:  Yes.

12           THE COURT:  And, it wasn't listed -- there was a

13     response to it from the Creditors Committee back then.  And,

14     you replied to that back then.  But, it wasn't listed for

15     hearing, is that correct?

16           MR. HAYES:  Yes, Your Honor.

17           THE COURT:  And, years went by.  There was an

18     Appellate process that was ongoing.  Two appears were

19     apparently inadvertently filed by the clerk's office, appeals

20     that you initiated.  And, they were denied, and now you've

21     appealed to the Court of Appeals on the order of confirmation.

22           But, two and a half years went by before you inquired

23     by letter directed to me in March of 2004 to say what happened

24     to this motion, can we have this motion listed.  What -- how do

25     I understand that gap, that failure on your part to bring this

Hayes - Argument                                    8

1    matter forward for me to look at, to resolve, to bring to

2    resolution?

3              MR. HAYES:  Well, Your Honor, I thought the order was

4    pending.  I was, you know, hopeful that there would be a ruling

5    on it.  I didn't know that I had to request a hearing.

6              THE COURT:  I see.

7              MR. HAYES:  The reason that I sent the letter when I

8    did that brought -- I mean, the appeal before the District

9    Court had been completed, and I wanted to proceed with the

10   Appellate Court.

11             THE COURT:  Uh-huh.

12             MR. HAYES:  So, I thought that I would again request

13   -- find out what had happened, because I still think the

14   shareholders need an equity committee to pursue the appeal at

15   the Third Circuit.

16             THE COURT:  Uh-huh.  What is your reaction to the

17   argument that now, at this stage, -- and the District Court has

18   determined that the appeal to the order of confirmation is

19   equitably moot, because the two entities, Genesis and

20   Multicare, have effectively combined that there is -- it's like

21   unscrambling the egg, if you will -- and that, at this stage,

22   to believe that the Court of Appeals might do something else

23   with it is unlikely?

24             MR. HAYES:  I don't think the unscrambling an egg

25   analogy is out.  I mean, I had never intended, you know, to

Hayes - Argument                    9

1   stop the execution of the bankruptcy plan.  My argument is on

2   the merits were that the senior lenders receive more than 100

3   percent of their value of their notes.  And, if that was

4   determined on the merits, then it would be -- the senior

5   lenders would compensate the equity holders.  And, so there

6   would be no need, you know, to unscramble the egg, so to speak.

7         And, that's essentially what the junior subordinated

8   debenture holders are arguing in their fraud allegation.  I

9   mean, they -- they see that the extra value went to the senior

10  lenders.  And, so there's no reason to upset a ruling that, you

11  know involves, you know, thousands of --

12        THE COURT:  Isn't that --

13        MR. HAYES:  -- individual entities.

14        THE COURT:  Aren't there two different matters

15  though?  In other words, as a shareholder, presumably you could

16  join the Haskell suit to assert the same causes against the

17  senior lenders that are asserted by the subordinated bond

18  holders.  We'll take up where that stands.  And, I have been

19  apprised that the matter has been referred to me, and we'll

20  move forward with that.

21        So, that will be litigated.  And, if, indeed, either

22  the subordinated bond holders or any parties that join in that

23  suit -- for instance, shareholders who contend that senior

24  lenders received more than they were entitled to -- might

25  benefit from that result, that's one set of circumstances

Hayes - Argument                                    10

1    Your cause is to disturb the plan of -- the confirmed plan of

2    Genesis and Multicare to undo it and to install some other

3    arrangement between all of the parties involved in that entire

4    picture.  Isn't that a different scenario altogether?

5          MR. HAYES:  Well, I think there are two different

6    scenarios.  But, I don't think that the shareholders' fraud

7    suit is the same as the subordinated debenture holders.  I

8    think, if Genesis was fraudulently taken into bankruptcy,

9    that's what the shareholders' suit would be, that the company

10   was fraudulently taken into bankruptcy, it should never have

11   been in bankruptcy.  And, therefore, the whole process which

12   took away the shareholders' equity, shouldn't have gone

13   forward.

14         THE COURT:  And, is that a cause that is being

15   asserted by -- or that was asserted by shareholders after the

16   bankruptcy was filed or is being asserted by shareholders

17   anywhere?

18         MR. HAYES:  I have no knowledge of that.

19         THE COURT:  And, so how does that have to do with the

20   opportunity of shareholders to now tap the resources of the

21   reorganized debtor to fund such efforts?

22         MR. HAYES:  I mean, I see that potential litigation

23   as separate from what went on in the bankruptcy court.  I mean,

24   after the company declared bankruptcy in -- when was it -- May

25   of 2000, I mean, these equity securities, like all the other

1   securities, tend to trade.  And, there are lots of equity

2   holders.

3            I mean, I had my equity in Genesis before it declared

4   bankruptcy.  I maintained it after it declared bankruptcy.

5   But, there are other members -- equity members who just bought

6   their stock after it was -- after it was in bankruptcy.  And,

7   so I think that, you know, their claim is with an equitable

8   distribution that arises from the bankruptcy, which --

9            THE COURT:  People who bought in as equity holders

10  after the bankruptcy are entitled to protections like a

11  committee, is that your argument?

12           MR. HAYES:  Yes.  Yes.  I mean, the same applies to

13  -- I mean, lots of the subordinated debt was acquired after the

14  bankruptcy.  And, that was one of the big complaints.  I don't

15  know --

16           THE COURT:  And, if you'll refresh me --

17           MR. HAYES:  And, the unsecured creditors had a

18  committee.

19           THE COURT:  There was no committee for

20  subordinated --

21           MR. HAYES:  Well, they were un --

22           THE COURT:  -- bond holders.

23           MR. HAYES:  -- they were unsecured creditors, and

24  they were on the Unsecured Creditors Committee.

25           THE COURT:  They were on -- some of these

Hayes - Argument                              12

1   subordinated bond holders were on the Unsecured Creditors

2   Committee, is that --

3              MR. HAYES:  Yes.

4              THE COURT:  Uh-huh.  Okay.  But, there was no

5   separate committee for subordinated bond holders, is that

6   correct?

7              MR. HAYES:  That's correct.  But, unless they did

8   have representation, it wasn't available to the equity

9   committee --

10             THE COURT:  Uh-huh.

11             MR. HAYES:  -- to the equity shareholders.

12             THE COURT:  Understood.  Anything else, sir?

13             MR. HAYES:  You know, the arguments that Genesis has

14  made in opposition to the Committee seem to revolve around

15  insolvency, and they argue that it was hopelessly insolvent.

16  And, they -- well, they've never defined what hopelessly

17  insolvent is, but they would like the Court to believe that

18  that's the only factor that has to do with appointment of an

19  equity committee.

20             And, the leading case on that is _Emons_.  And, in the

21  _Emons_ case, there was an equity committee appointed, even

22  though the Court apparently felt that it was hopelessly

23  insolvent because they saw an ownership pattern in the

24  bankruptcy that was similar to what we have here.  They had

25  bond holders and equity holders that was institutionally held,

1   whereas the public were only the equity holders.  And, so they

2   didn't -- they had the conflicting interest that we have here.

3   And, so the Court in Emons appointed an equity committee.

4           THE COURT:  Uh-huh.

5           MR. HAYES:  And, then there's more recent cases that

6   list a number of other factors besides insolvency that argue

7   for the appointment of an equity committee.  And, I think, it

8   seemed, in my interpretation of it, the principle factor is

9   whether it -- whether the equity holders were represented --

10  maybe not by an equity committee, but the example given in -- I

11  think it was the Kalvar case was they felt that -- the Court

12  felt that the equity committee was represented by the officers

13  and directors of the company, who are also equity holders and

14  they're also active in the bankruptcy.  And, I guess that's a

15  judgment for the Court to make.

16          But, in this case, the officers and directors of the

17  company, they were mainly interested in working out special

18  deals that compensated them for their equity.  And, so they

19  abandoned the shareholders.  So, I think the -- you know, the

20  balance of the arguments argue in favor of an equity committee

21          THE COURT:  Understood.  Thank you, sir.

22          MR. HAYES:  Thank you.

23          MR. SILBERGLIED:  For the record, once again, Russ

24  Silberglied of Richards, Layton & Finger.  Your Honor, some of

25  those arguments might have been arguments that could have been

1    made in the summer or fall of 2000.  They're not arguments that

2    can be made in the spring of 2004.

3         I'm going to attempt to be brief here, because it was

4    obvious to me, from Your Honor's remarks, that you've read the

5    papers.  So, I'm going to try not to repeat them.  Basically,

6    in almost summary form, the motion is fraught with procedural,

7    as well as substantive problems.

8         It's seeking to appoint a committee three years post

9    confirmation.  It's seeking to appoint a committee for appeal

10   purposes, even though the committ -- even though the Court

11   already denied the formation of a committee for all purposes.

12   So, it's a collateral attack on a prior order of the Court that

13   could have been appealed.

14        The appeal Mr. Hayes wants a committee to prosecute

15   has been dismissed as equitably moot.  So, I'm not really sure

16   what a committee could do.  And, 99 percent of the

17   distributions have been made under the plan, so there's really

18   nothing left for a committee to do.

19        THE COURT:  Help me to understand that.  Is there a

20   hold back for claims unresolved?  Is that --

21        MR. SILBERGLIED:  There's a few of the -- for

22   instance, I believe there may be a small hold back for the few

23   remaining personal injury claims.  There's, of course, the IRS

24   claims and the New Jersey claims that we just finished with

25   today.  It's a handful of claims.  There's really nothing left.

1      THE COURT: And, the Scherfel matter is still on

2   appeal?

3      MR. SILBERGLIED: The Scherfel matter, I believe, is

4   still on appeal, although I'm not counsel of record in that

5   matter. However, the Court estimated that claim at zero, which

6   was affirmed by the District Court. And, the Third Circuit

7   said that no stay pending appeal was appropriate.

8      And, as a result, you know, we've reserved zero for

9   that claim, because, you know, three Courts have said that that

10   was appropriate to do. Otherwise, we would have made 50

11   percent of the distributions or less. It was a billion dollar

12   claim.

13      So, 99 percent of the distributions have been made.

14   And, getting to one of the points that Your Honor raised. The

15   relief sought in the Haskell litigation is, in fact, different

16   than what would be in an appeal. The Haskell litigation

17   doesn't and can't ask -- or the Haskell litigants don't and

18   can't ask this Court to unscramble the eggs. They ask for

19   fraud damages.

20      Now, we think that's highly objectionable, and we've

21   moved to dismiss on any number of grounds, which I can talk

22   about if Your Honor is interested. But, the point is that, if,

23   for whatever reason, the Court disagrees, the remedy that is

24   sought in the complaint is damages for fraud against a

25   reorganized entity, the bank group, and other lenders. It's

Silberglied - Argument                                    16

1    not to reallocate distributions.

2           Now, to show you why that's a significant difference,

3    that's the whole reason why stays pending appeal are a remedy

4    that one could get.  The whole point of a stay pending appeal

5    of a confirmation order is that, if you don't get a stay

6    pending appeal, somebody is going to start to make

7    distributions.

8           And, that's why very often there's litigation in

9    confirmed plans about whether a stay pending appeal is or is

10   not appropriate.  Mr. Hayes never moved for one.  I will note

11   that somebody else did move for one which was Mr. Grimes, one

12   of the bond holders.  And, that motion was denied by this

13   Court.  Mr. Grimes moved again in the District Court for a stay

14   pending appeal, and that was denied by the District Court.

15          So, presumably, if Mr. Hayes had asked for one, it

16   would have been denied also for the very same reasons.

17   Whatever it is, he never asked.  And, as a result, we've made

18   99 percent of the distributions under the plan.  What's he

19   going to get for equity at this point?  You can't get the money

20   back, and he's not asking for fraud damages.

21          Now, by the way, before we get a fraud damages suit

22   on our hands, I just want to point out a couple of things in

23   response to what I've heard.  First of all, obviously solvent

24   entities may file for bankruptcy.  There's no prohibition in

25   the Bankruptcy Code against solvent entities filing for

1   bankruptcy.

2          So, even if Mr. Hayes, somehow or another, proved

3   that Genesis were solvent as of June of 2000, which it wasn't,

4   that's not fraud.  The company could have filed for bankruptcy

5   anyway.  And, what fraud?  This is the first we've ever heard

6   the stockholders claiming fraud, but there's no particularity.

7          If he's claiming fraud that's a securities fraud, --

8   I wouldn't have bought my shares if it -- you know, if it

9   weren't for these disclosures, and so on and so forth -- well,

10  that claim simply would have been subordinated under Section

11  510(b) back to equity, or he'd be in the exact same place he is

12  today anyway.  So, none of that makes any difference

13  whatsoever.

14          For all of those reasons, this motion ought to be

15  denied.  It's three years too late at least.  It's probably

16  four years too late.  But, it's certainly at least three years

17  too late.  And, I'll -- I'll just end on one last note.

18          There have only been two or three cases that we could

19  locate ever that have approved the formation of any level of

20  committee -- and none of them were an equity committee, by the

21  way -- post confirmation.  And, those were on very unique

22  facts, and there's a debate in the case law as to whether it's

23  even permissible statutorily to appoint a committee post

24  confirmation.  This case cert -- I mean, even if you could get

25  past the statutory construction arguments, this case certainly

Silberglied - Argument                          18

1    isn't the case to become the third or fourth such case.

2         THE COURT: Yes.  Thank you, Mr. Silberglied.  Let me

3    ask you one question, because it's troubling that at motion --

4    any motion, without any reference to the merits of this

5    particular motion, was out there unresolved for two and a half

6    years.  How did that happen here?  Can you help me to

7    understand what procedures were not followed and how this came

8    to be?

9         MR. SILBERGLIED: Yes, Your Honor.  I was troubled by

10   that as well when I first saw Mr. Hayes' letter.  To be

11   perfectly honest, I did not know that this matter was

12   outstanding.  I think the problem was as follows:

13        The motion was not electronically filed.  I don't

14   believe it was even on the Court's docket at the time.  I think

15   it may have come up afterwards.

16        THE COURT: When did Delaware go into electronic

17   filing?

18        MR. SILBERGLIED: It was before this motion was

19   filed.  I can't tell you the precise date.  But, I remember,

20   for instance, that it was somewhere around the time that we

21   filed the plan.  So, that would be the spring of 2000, because

22   I remember the procedural glitches with the system going down

23   as we were trying to file the disclosure statement that's an

24   unfortunately vivid and painful memory.  So, yes, the e-filing

25   system was up and running full well at that time, and the

1   motion wasn't e-filed.

2         I think it may have made it to the docket several

3   months later.  But, frankly, it was never called to my

4   attention.  I'm not clear as to whether -- I can't tell,

5   looking back at this three years later, whether my firm was

6   ever served with the motion or not.  I'm simply not sure.

7         THE COURT:  Well, --

8         MR. SILBERGLIED:  What I know is that -- at a

9   minimum, that the Creditors Committee received it, because the

10  Creditors Committee objected.  But, in any event, the

11  procedural way that motions get teed up under the Delaware

12  local rules is for somebody to put a notice of motion on top

13  and tee it up for a particular omnibus hearing so that the

14  parties understand -- the people responding understand when it

15  is that they're supposed to file an objection.

16        THE COURT:  Somebody meaning theoretically the

17  movant --

18        MR. SILBERGLIED:  The movant, absolutely  It's the

19  movant's --

20        THE COURT:  -- would --

21        MR. SILBERGLIED:  -- responsibility under the local

22  rules.

23        THE COURT:  -- would alert, say, counsel for the

24  debtors that this -- they wanted to have this heard on the next

25  omnibus hearing date, let's say, or the like.

1        MR. SILBERGLIED:  Yes, Your Honor.

2        THE COURT:  Uh-huh.

3        MR. SILBERGLIED:  So, that's the movant's

4   responsibility under the local rules of Delaware.  So, I think

5   the reality is, if we had seen it, we probably would have

6   objected, despite the inconsistencies or deficiencies under the

7   local rules.  We didn't see it.  Otherwise, as I said, we

8   likely would have.

9        But, the fact of the matter is that no notice of

10  motion accompanied the motion, it wasn't e-filed, so we -- it

11  just didn't come to our attention through the appropriate or

12  the typical means.  And, I think that's the explanation as to

13  why no action was taken on it.

14       THE COURT:  Understood.  Thank you.

15       MR. SILBERGLIED:  Thank you, Your Honor.

16       THE COURT:  Let me reflect the procedural history

17  here, because I do think it's important to situate this motion.

18  The -- these cases were filed on June 22nd, 2000.  And, about a

19  year later, -- I have two dates, June 5th and July 6th.  I'm

20  not sure which is the right one.  Perhaps July 6th was an

21  amended version -- the plan of reorganization and disclosure

22  statement were filed in the cases.

23       The confirmation hearings were scheduled for late

24  August.  I note that in July, -- July 10th, apparently, 2001,

25  Mr. Hayes, the movant here, requested the United States Trustee

1   to appoint an equity security committee.  That request was

2   opposed by counsel for the debtor and counsel for the Creditors

3   Committee -- the Unsecured Creditors Committee.  And, the

4   United States Trustee denied the request on or about August

5   2nd, 2001.

6           That was followed a few days later, August 8th, 2001,

7   with a formal motion filed by Mr. Hayes to appoint a committee.

8   And, that motion was heard in conjunction of the confirmation

9   of the debtor's Chapter 11 plan.  Again, that motion was

10  formally opposed by the Creditors Committee.

11          The -- as I said, we heard the confirmation questions

12  August 28th and 29th.  I issued an opinion on September 12th,

13  2001, which, among other things, confirmed the plan that was

14  proposed and rejected the request by Mr. Hayes to appoint a

15  committee.  An order to that effect was entered September 20th.

16          A notice of appeal was filed apparently on September

17  18th, and a motion, as we've noted, was filed by Mr. Hayes on

18  October 1st, 2001 to appoint the committee.  And, we had no

19  hearing set.  There was a response from the Creditors Committee

20  to the motion.

21          I assume that the motion was properly served, but the

22  motion was not put on the calendar.  I'll accept Mr.

23  Silberglied's recitation or reference to the Delaware local

24  rules that imposes the obligation on the movant to arrange for

25  the matter to be placed on the motion list -- on the omnibus

1    list for that particular case so that it can be considered.

2            I do have another notice of appeal date, September

3    27th, from Mr. Hayes. I am not sure. Perhaps the September

4    18th date was by another appellant. In any event, there was a

5    notice of appeal filed. Apparently, the notice of appeal was

6    filed twice in the District Court by perhaps error of the

7    District Court. Mr. Hayes, did you have clarification on that?

8            MR. HAYES: Well, as I recall, the first -- I filed

9    the first one -- notice of appeal before the opinion was filed.

10   I mean, the opinion --

11           THE COURT: Before the order was filed perhaps. Yes,

12   September 18th. The order was filed September 20th. In other

13   words, my opinion was published September 12th.

14           MR. HAYES: And, so I went back to the clerk and I

15   just asked them to amend --

16           THE COURT: Yes. And, instead of amending, they

17   incorrectly filed apparently another notice of appeal. So

18   that, there were two appeals pending from you to the order of

19   confirmation. The first appeal, I guess, was resolved

20   September 30th, 2002 by the District Court with a decision by

21   the District Court that the appeal should be dismissed on

22   equitable mootness grounds.

23           The second appeal, which was -- really it looked like

24   the same appeal, was dismissed March 12, 2003 on the basis that

25   it was the same appeal that was filed earlier. And, a

1    reconsideration of that decision was denied on -- apparently on

2    February 26th, 2004.  And, I believe that an appeal -- that you

3    filed an appeal to the Court of Appeals on March 25th, 2004.

4        In March -- March 13th, 2004, Mr. Hayes, the movant

5    corresponded with me to inquire about the status of this motion

6    and to reflect that the motion was pending and should be acted

7    upon.  He alluded to a complaint that had been filed, I

8    believe, in the Southern District of New York -- I'm not sure

9    -- the Eastern District?

10        MR. SILBERGLIED:  It was originally filed in the

11    State Court in New York and removed to the Southern District of

12    New York.

13        THE COURT:  Okay.  A suit by subordinated bond

14    holders in the Genesis matter pre-confirmation against senior

15    bond holders -- senior lenders rather -- in the case contending

16    that the senior lenders had exercised fraud in the process of

17    confirmation in the process of the valuation of the debtors and

18    that there ought to be damages paid by the senior lenders to

19    the plaintiffs in connection with that alleged fraudulent

20    activity.

21        Mr. Hayes relies in part on the allegations in that

22    complaint to support the proposition that a Creditors Comm --

23    that an equity security committee should be appointed to assist

24    the former equity security holders to assert their positions on

25    appeal to the Court of Appeals at this point.  And, I will deny

1    that request.  I think that procedural and substantive bases

2    exist for that denial.  I agree with counsel for the debtors'

3    arguments in that regard.

4            Procedurally, this request is grossly untimely.  We

5    had -- I ruled on this matter when I rejected the quest for

6    equity security holder status at the time of confirmation.  I

7    ruled on it in my September 12, 2001 opinion.  In fact, one of

8    -- a basis for -- a ground for denying the request was that it

9    was untimely then back two and a half years ago, almost three

10           Indeed, one of the arguments advanced by various

11   objectors, including perhaps Mr. Hayes at the time, was that

12   the reorganization process had been -- had gone forward too

13   quickly, that there was some untoward -- there was a suggestion

14   that the speed at which the process had gone forward suggests

15   some untoward activity by the proponents of the plan and those

16   who supported the plan.

17           And, I rejected that in a discussion of the good

18   faith of the plan and its proponents, noting that the case had

19   been pending for a year at that point and that the desire to

20   proceed expeditiously, barring some extraordinary presentation,

21   could not defeat a good faith presentation.  And, there was no

22   basis, other than a -- an allegation of bad faith to support

23   the concern about the speed with which the plan was proposed

24           So, we had a year, as counsel for the debtor recalls,

25   for equity to come forward to seek representation, to seek to

1    assert its position.  Indeed, equity could always participate
2    in the case, could always obtain a representation on their own.
3    If there was a basis for the designation of a committee, that
4    could have been applied for sooner than the eleventh hour
5    basically.  Indeed, it was applied for in July initially
6    through the United States Trustee after the plan and disclosure
7    statement were submitted.

8         Indeed, perhaps equity will suggest -- equity
9    represented by Mr. Hayes here -- that it wasn't until then that
10   it became apparent that the intention of the debtors or the
11   senior lenders or a combination of them to, in effect,
12   extinguish equity -- it was not apparent to equity until then
13   that that would be the intent of the proponents of the plan.
14   And, that may be.  But, the opportunity to take an active role
15   through representation through a prospective committee had to
16   have been presented earlier in order to have any prospect of
17   achieving that result.

18        Indeed, in many cases, there may be a basis beyond
19   threshold demonstration of insolvency to warrant the
20   appointment of a committee.  There are cases cited in the
21   submissions in which there is serious contest about valuation.
22   And, indeed, in this case, we had at confirmation contest about
23   valuation, and that contest was -- in the words that I used --
24   vigorously scrutinized and resolved in the opinion.

25        The balance was then, when I denied the motion in the

1    September 12th opinion, substantially in favor of rejecting the

2    equity security holders request, not only because the

3    insolvency question, as I determined it to be resolved in the

4    opinion, so favored the basic contemplation that there was no

5    equity to reach shareholders, even in the most favorable

6    interpretation of the various expert opinions that were

7    received.

8           The fact there was, for the most part, a consensual

9    plan of the most substantial interests represented in the case,

10   compelled, in my mind, the drawing of the balance against the

11   constitution of a -- an equity security committee at that point

12   in the case and in that context.

13          And, things have only progressed to reduce the

14   opportunity of an equity security committee to be appointed

15   rather than enhanced, the passage of time alone certainly, the

16   fact that there was no stay pending appeal of the confirmation

17   order.  And, therefore, the process of consummation of the plan

18   went forward, distribution to the effect of -- as counsel

19   reflects -- 99 percent of what was to be distributed.

20          Mr. Hayes suggests that he is not seeking to disrupt

21   that distribution, but simply to reallocate the senior lenders'

22   receipts to others -- I'm not -- to whom -- I'm not sure, to

23   equity, presumably.  He doesn't insert in that analysis the

24   interests of the other parties -- that is, the unsecured

25   creditors, the subordinated bond holders -- who would precede

1    any taking by equity in any event.

2              And, how you could take away what you have already

3    given in this context I'm not sure.  I have grave doubts that

4    such a procedure could be accomplished in a way that would not

5    require the unscrambling of the egg, if you will.  Indeed, the

6    concept of equitable mootness can be applied by the Bankruptcy

7    Court and has substantial application in this context.

8              I also agree wholeheartedly with counsel's concerns

9    about post-confirmation appointment of committees.  I think

10   that such a process may not be countenance within the framework

11   of the Bankruptcy Code.  And, even if it is, it would be

12   available only in the most extraordinary of situations.  And, I

13   cannot fit this set of facts into that kind of equation.

14             So, I will determine to deny the motion of the -- of

15   Mr. Hayes to appoint an equity security committee at this stage

16   and in this posture.

17             MR. HAYES:  May I be heard?

18             THE COURT:  Certainly.

19             MR. HAYES:  Your Honor, you know, the equity holders

20   were never a party to any of the bankruptcy proceedings.  As an

21   equity holder, I was first notified when the -- when the

22   notification was approved.  And, I responded at that time.  I

23   mean, I -- you know -- so, I think it's a false argument to

24   suggest that the equity holders --

25             THE COURT:  In other words, you mean you had no

Colloquy                                28

knowledge about the bankruptcy and --

MR. HAYES:  I knew there was bankruptcy.  I didn't --

THE COURT:  That's all I'm saying.  I didn't say that you were noticed of any plan to extinguish the interests of the equity security holders or the like.  The simply fact that the bankruptcy was filed a year earlier is all I was alluding to.

MR. HAYES:  And, then -- so, when the plan was arrived at -- or -- that's when the equity holders were notified and that's when they were notified of their rights.  That's when they were notified that the plan that had been contemplated was going to extinguish their equity.

THE COURT:  Yes.  And, I noted that in my comments.  And, Mr. Hayes, at this point I have ruled.  So, I'm not planning to revise my ruling.  You're welcome to make an additional comment for the record if you like.

MR. HAYES:  But, it was after the time that -- after the plan was conceived and approved, this is when the equity market -- and this is what got my attention -- in comparable health care companies appreciated by 60 percent that changed all the valuations that they had done.

And, when I asked the Trustee to appoint a committee, the debtor responded about their mantra of there being hundreds of millions of dollars insolvent.  And, that response is made before any of the adjusted valuations were put forth.  And, I was very angry when Mr. Walsh told me he walked into court --

Colloquy                                           29

1    you know, that he -- I felt that he had misrepresented to the

2    Trustee the status of the valuations.  And, his only comment

3    was, well, he didn't know.

4         THE COURT:  Well, Mr. Hayes, this is one of the

5    problems with your motion to begin with.  These new points of

6    information that we are not able to deal with deliberately,

7    were not included in the papers, were not available for

8    scrutiny or response.  Even if they were, I would not change my

9    ruling, because -- for all of the reasons that I have

10   expressed.  So, you can't add new items each -- with each level

11   of review.

12        MR. HAYES:  Your Honor, the equity holders have a

13   basic constitutional right to their property under the Fifth

14   Amendment.  Property cannot be taken without due process and

15   without compensation.  It's been done both in this case -- in

16   this hearing.

17        I mean, I -- I cannot believe that the Constitution

18   does not apply to Bankruptcy Court, the Constitution does not

19   apply to these principles of equity -- equitable mootness, the

20   Constitution does not apply to this priority scheme that leaves

21   the shareholders out.

22        THE COURT:  Well, there's no doubt that the

23   Constitution applies.  There's no doubt that due process was

24   afforded in this context.

25        MR. HAYES:  It was not.

Colloquy                                    30

1       THE COURT:  Well, I beg to differ.  Indeed, these

2   concerns were seriously considered at the confirmation hearing,

3   and decisions were made, and appeals were taken, and stays were

4   rejected, -- quests for stays, and the plan was consummated.

5   That is procedural due process, and it was afforded in this

6   case.  I thank you, Mr. Hayes.

7       Moving then to the Haskell matter, I do note that

8   there was a propo -- there was a referral of the matter by

9   Judge Robinson here and that the parties have agreed to a -- a

10  schedule for response to the debtor's or the plaintiff's -- the

11  defendant's rather -- motion to dismiss, and that's fine.

12      As I calculated, it requires a hearing date in July

13  on the motion to dismiss.  Is that an accurate assessment?

14  We're talking about an April 9th stipulation with less than 60

15  days to response, and then 20 days to reply, which brings us

16  towards the end of June, and so on, contemplating a July

17  hearing date.

18      MR. SILBERGLIED:  I believe that's correct.  Thank

19  you, Your Honor.

20      THE COURT:  Okay.  Let's make it Friday, July 16th at

21  11 a.m.  You'll convey that to other parties?

22      MR. SILBERGLIED:  Your Honor, I have two comments

23  about it.  The first is whatever -- whatever date it is, there

24  are multiple parties.  So, if I might -- I'm happy to take back

25  whatever date there is.  But, if somebody who's not in the

1   courtroom has a conflict, might we get back with Your Honor on

2   that?

3            THE COURT:  Of course.

4            MR. SILBERGLIED:  The second thing is I personally

5   will be speaking at a conference actually in South America on

6   that day.

7            THE COURT:  Oh.

8            MR. SILBERGLIED:  I -- I'm not --

9            THE COURT:  How nice for you.

10           MR. SILBERGLIED:  Thank you, Your Honor.  I'm not

11  anticipating being the person arguing, so I suppose it's not

12  necessary for me to be here, although I would have liked to.

13  But, seeing as how there are multiple parties that we need to

14  coordinate with, perhaps I ought to keep that in abeyance and

15  simply notify chambers when I've spoken to other parties.

16           THE COURT:  If the date is not good, give me an idea

17  of what conflicts there are and what availability there is in

18  July for the parties that are directly involved, and I'll

19  certainly try to accommodate that.

20           MR. SILBERGLIED:  Thank you, Your Honor.

21           THE COURT:  Is there anything else on this record?

22           MR. SILBERGLIED:  No, Your Honor.  That's the last

23  item on the agenda.

24           THE COURT:  Thank you all.

25                        * * * * *

32

# C E R T I F I C A T I O N

I, Frances L. Maristch, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____7/16/04_____                    _____
DATE                                     FRANCES L. MARISTCH