ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-2692 (JHW) |
| Debtors, | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| JAMES J. HAYES | ) | |
| Appellant | ) | |
| | ) | |
| v. | ) | C.A. No. 04-0477 |
| | ) | |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | |
| Appellees. | ) | |
| _____ | ) | |

## APPELLANT'S REPLY BRIEF

```
FILED

JUN 1 5 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

James J. Hayes
Appellant Pro Se
4024 Estabrook Dr.
Annandale, Virginia 22003
(703) 941-4694

# TABLE OF CONTENTS

Table Of Authorities ................................................................................................ ii

Argument ............................................................................................................... 1

A. Genesis' Arguments For Dismissing Appeal On Procedural Grounds Are
   Without Merit .................................................................................................. 1

    1. Equitable Mootness ................................................................................... 2
    2. Collateral Estoppel .................................................................................... 4
    3. Res Judicata ............................................................................................... 6
    4. Actual Mootness ....................................................................................... 7

B. Genesis' Factual and Legal Conclusion That Insolvency Is The Primary Issue In
   The Appointment of An Equity Committee Is Based On A Distorted Analysis .......... 8

C. The New Evidence Of Higher Genesis Values Contained In The Haskell Fraud
   Complaint Supersedes Pre-Confirmation Insolvency Arguments .............................. 11

Conclusion ............................................................................................................ 18

Certificate of Service ............................................................................................. 19

Appendix (Hayes' Seven Confirmation Hearing Illustrations) ......................................... 20

## TABLE OF AUTHORITIES

*Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.)*,
2005 WL 1038920 ..................................................................................................... n1-p1

*In re Continental Airlines*, 91 F. 3d 553 (3rd Cir. 1996)
 (en banc 7-6) (cert. denied) ........................................................................................2,3

*In re Docteroff*, 133 F. 3d 210 (3rd Cir. 1997) ...................................................................6

*In Re Emons Indus., Inc.* 50 B.R. 692 (Bankr. S.D.N.Y. 1985) ......................................8,9

*In Re Genesis Health Ventures Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)......n2-p4,5,n5-p8

*Grimes v. Genesis Health Ventures, Inc.*, 280 B.R. 339 (D. Del. 2002) .............................2

*In the Matter of Kalvar Microfilm, Inc.*, 195 B.R. 599
(Bankr. D. Del. 1996) ........................................................................................ n1-p1,9,11

*In re PWS Holdings Corp.*, 258 F. 3d 224 236 (3rd Cir. 2000)............................................3

*In re Zenith Electronics Corp.*, 329 F. 3d 338 347 ( 3rd Cir. 2003)...........................3,n4,p7

## ARGUMENT

### A. Genesis' Arguments For Dismissing The Appeal On Procedural Grounds Are Without Merit

Genesis argues that this Court should dismiss the appeal of the Bankruptcy Court's denial of a post-confirmation equity committee because it is equitably moot or alternatively because it is actually moot. Then, if this Court finds these arguments unavailing, Genesis argues that a post-confirmation equity committee is barred by the doctrines of res judicata and collateral estoppel. Evaluating this series of antonymous arguments is a waste this Court's resources. This is even more evident considering that the Genesis Brief does not discuss the prime statutory and constitutional factor controlling the appointment of an equity committee – that is whether the equity holders were adequately represented in the bankruptcy proceedings that cancelled their equity without compensation. If shareholders were adequately represented; then Genesis' equitable mootness, res judicata and collateral estoppel arguments merit this Court's consideration. If equity holders were not adequately represented,[1] this Court should remand this case to the Bankruptcy Court for the appointment of an equity committee so

---

[1] Evidence that Genesis equity holders were not adequately represented in the bankruptcy proceedings continues to accumulate. The Haskell litigation, now on appeal to this Court, alleges the defendant Senior Lenders 'conspired with Genesis management to put the Company into bankruptcy and 'cram down' a reorganization plan that would eliminate junior creditors and existing stockholders, while conveying virtually total ownership of Genesis to the senior creditors.' *Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 2005 WL 1038920 at 3, (App. A of Genesis Brief).

Dicta in *Kalvar Microfilm* on adequate representation noted: "While not central to the court's evaluation of this motion, Anacomp's officers and directors were actively in the restructuring negotiations. ...they attempted to obtain value for the equity holders." *In the Matter of Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996). Thus what should be a factor negating the need of an equity committee (management actively negotiating for equity holders), has in this case (management at best indifferent and allegedly conspiring against equity holders) become a factor favoring the appointment of an equity committee.

that it can determine how equity holders can now, at least, be represented in the post-confirmation actions.

1.  Equitable Mootness

The Genesis Brief presents a half-baked analysis of the judicial doctrine of equitable mootness based on the five-factor *Continental Airline* analysis.  *In re Continental Airlines*, 91 F. 3d 553 568 (3rd Cir. 1996) (en banc 7-6) (cert. denied) After belaboring the first two factors that favor the application of equitable mootness, the Genesis analysis disappears as it requests this Court to apply its analysis of the final three *Continental* factors in *Grimes v. Genesis Health Ventures, Inc.*, 280 B.R. 339 (D. Del. 2002) to moot this appeal's request for a post-confirmation equity committee.  Genesis stated rational is that:

> Hayes was not the only objector to appeal the denial of the appointment of an equity committee in the Genesis Matter, and in that appeal, where these issues were fully briefed on the merits; this Court concluded that the appeal should be dismissed as equitably moot.
>
> In *Grimes*, this Court evaluated the Plan by analyzing the Plan in light of each of the *Continental* factors …and determined that the [appeal] must be denied on the grounds of equitable mootness. The same logic applies here. The Court cannot conceivably grant any effective relief on this appeal.  It simply is absurd to suggest that an equity committee should be appointed to challenge a Plan that this Court already has concluded cannot be challenged.
>
> Genesis Brief at 8-9.

One of the many problems with using this rational is its false premise as Hayes was, in fact, the only objector to appeal the denial of the appointment of an equity committee. Grimes was a subordinated bondholder whose requested relief was "for the Court to require the Reorganized Genesis to issue him additional shares of common stock. (*Grimes* at 8.) This Court determined that "the rights of third party investors would be

adversely affected by the relief [Grimes] seeks..." (factor three); and that "the issuance of additional shares to him would be unfair to the other creditors in [Grimes] own class..." (factor four).  (Id. at 12 & 13). In the Hayes appeal, the requested relief of an equity committee would not affect the rights of parties not before the courts (factor three) or affect the success of the Plan (factor four). Both of these *Continental* Factors proscribe an equitable mootness finding in this appeal.

In addition, the appointment of an equity committee could benefit the Genesis estate and the other creditor classes. If the committee is successful in having the equitable mootness and constitutional issues in the substantive appeal examined on the merits, and then demonstrates that the relief requested – the recovery of the distributions made to the Senior Lenders that exceeds the amount of their claims – would not violate factors three and four of *Continental*; then the unsecured creditors with unfulfilled claims would also participate in that recovery.

Recent Third Circuit reversals of equitable mootness determinations noted that:

> The doctrine has been carefully developed to apply only in that rare situation in which a successful appeal would undo a complicated plan of reorganization.
>
> .   .   .
>
> Here, the Trustee seeks the disgorgement of $76,500 in professional fees... Far from causing the reorganization plan to unravel, the Trustee's appeal, if successful, would return money to the estate.

*In re Zenith Electronics Corp.*, 329 F. 3d 338 347 ( 3rd Cir. 2003)
(affirming *In re PWS Holdings Corp.*, 258 F. 3d 224 236 (3rd Cir. 2000)

The analysis underlying Hayes' substantive appeal combined with the accounting allegations in the Haskell fraud complaint place of the Senior Lenders' recovery in excess of their claims in the range of a billion dollars. (Please see Hayes Brief at 10 and the 01-

718 Brief at 11). Under these circumstances, the facts that the Plan has been substantially

consummated and that Hayes did not obtain a stay of the Confirmation Order should have

little or no weight in determining whether the motion for a post-confirmation equity

committee is equitably moot. Indeed all the equity considerations support the

appointment of a post-confirmation equity committee.

## 2. Collateral Estoppel

Genesis argues that this appeal is barred by the doctrine of collateral estoppel.

Analysis supporting this argument rests on the Bankruptcy Court's opinion in *Haskell*,

which too quickly perhaps, dismissed the fraud on the bankruptcy court suit on this same

doctrine. (Genesis Brief at 10) Notably, the Bankruptcy Court declined to apply this

reasoning in its ruling denying the appointment of a post confirmation equity committee

(Third Motion) that arose from the same bankruptcy proceeding as the *Haskell* suit.

Genesis argues that "the issue sought to be precluded – the appointment of an

equity committee after the confirmation of the Plan – is identical to the issue set forth in

the First Motion [the appoint of an equity committee before the Confirmation Hearing]."

(Id. 10) To reach this conclusion, Genesis defines "issue" in the broadest sense. [2] The

---

[2] Of course if the "issue" is broadly defined, any issue could be precluded as this Court will undoubtedly see in its upcoming review of the Haskell appeal. In that case, the Bankruptcy Court defined the issue as the proper enterprise value of Genesis and because that issue was extensively explored in the bankruptcy confirmation hearings, the court determined that Haskell was collaterally estopped even from bringing a suit that alleged that the enterprise value adopted by the court was obtained through fraud! Defining the issue more narrowly produces a different result. Enterprise value is equal to EBITDA multiplied by an EBITDA multiple. At the confirmation hearing, experts for the parties and the Haskell objectors opined on the most appropriate EBITDA multiple for Genesis. And if the EBITDA multiple were the sole determinant of enterprise value, Haskell would be collaterally estopped from beginning new litigation. But an equally important component of enterprise value is the EBITDA itself and that number was prepared by Genesis management supposedly following generally accepted accounting principals (GAAP). Genesis management had projected 2001 EBITDA at $215 million, which included about ten months of actual results. The Haskell objectors opined the value could reach $15 million higher based on increased government payments from the implementation of the Medicare, Medicad and SCHIP Benefits and Improvement Act of 2000. (*Genesis*, 266 B.R. at 613-14.) And if this difference in opinion on two months of projected EBITDA were the sole EBITDA issue, Haskell would also be collaterally estopped. But the

underlying issues at the time the requests were made, however, were very different. Hayes' first request for an equity committee was made in July 2001, shortly after the notice that a reorganization plan (Plan) had been negotiated and a disclosure statement was approved by the Bankruptcy Court. At this time, Hayes saw that an index of health care stocks compiled by *Investors Business Daily* had appreciated by 60% after the valuations underlying the Plan were completed. So, in addition to requesting appointment of an equity committee, the First Motion sought to postpone the scheduled confirmation hearing so that the equity committee's financial advisors could undertake their own valuation of Genesis. The Bankruptcy Court essentially mooted the First Motion by delaying its decision until after the confirmation hearings.

In the opinion on confirmation, the Bankruptcy Court concluded that the First Motion was "untimely and unrealistic" and "would only serve to unduly delay these cases." *Genesis*, 266 B.R. at 620. Rather than appeal the denial of the First Motion, Hayes saw that the Bankruptcy Court's specific objections would not be valid for a post-confirmation committee. Consequently, the Third Motion was filed after Hayes had filed his notice of appeal of the Confirmation Order and sought the legal representation of the committee to argue the appeal. The Third Motion was filed shortly after the notice of appeal, and was timely in this sense where the First Motion, which was filed after a reorganization plan had been negotiated, was not. The Third Motion didn't seek a stay of the Confirmation Order, or otherwise delay the effective date of the Plan where the

---

Haskell complaint, however alleges ten adjustments to EBITDA totaling $123 million that Genesis management, based on GAAP, should have included in their 2001 and 2002 EBITDA projections. (Hayes Brief at 10) And if the "issue" then is whether these adjustments are needed for a fair presentation of Genesis' EBITDA; then Haskell is not collaterally estopped from bringing the new litigation. An excerpt from the Haskell complaint of the accounting surrounding Genesis manipulation of its insurance reserves is provided on pages 13-15 of this brief.

First Motion sought to postpone the Confirmation Hearing. The First Motion required the assistance of financial advisors where Third Motion required, initially at least, only legal counsel. Clearly, the specific issues underlying the Third Motion are very different than the issues underlying the First Motion.

Genesis remaining analysis attempts to show that the Bankruptcy Court's denial of the First Motion was in some way related to the Confirmation Hearing and the Confirmation Order. Aside from the Bankruptcy Court's acknowledgement of having received the motion for an equity committee, the issue was never raised in the confirmation hearings. Likewise the issue was not discussed in the Confirmation Order. The Bankruptcy Court announced the denial of the equity committee along with the other objections in the opinion on confirmation that was filed eight days before the Confirmation Order and which has been the cause of so much confusion in this Court. Thus, the Genesis analysis fails to establish criteria two, three and four that the Third Circuit established in *In re Docteroff*, 133 F. 3d 210 214 (3rd Cir. 1997) for establishing collateral estoppel.

### 3. Res Judicata

Genesis arguments that the Third Motion is barred by the doctrine of res judicta is based on false factual premise that "Hayes' current appeal is based on the same issues and the same facts as his First Motion. As explained above for collateral estoppel, this assertion is simply not true as the issues and facts underlying the First and Third Motions are very different.

Genesis attempts to bolster their argument by broadening the issue to include "effective relief." Genesis then incorrectly references the Third Circuit as "agree[ing]

that there can be no effective relief granted." (Genesis Brief at 9)  The Third Circuit,

however, didn't review or opine on any of the equitable mootness issues – "we will not

address Hayes's equitable mootness arguments and other related arguments."[3] (App. M at

4)  No court has determined that there can not be effective relief granted or that an equity

committee could not provide effective relief.[4]  Mischaracterizing the Third Circuit's

opinion is simply another desperate attempt by Genesis to find some support for their

arguments.  Their failure in this effort is reflected in the Bankruptcy Court ruling, which

did not cite the doctrine of res judicata as a reason for deny a post-confirmation equity

committee.

### 4. Actual Mootness

Genesis, which after the confirmation was 94 per cent owned by the Senior

Lenders, argues that if the Supreme Court rejects Hayes' petition for certiorari; "there

will be no conceivable purpose for an equity committee." (Id. 11)  This is simply not true,

for in this event an equity committee could seek to intervene in the *Haskell* appeal, or

bring a fraud on the bankruptcy suit for the benefit of the Genesis estate.  The equity

holders who did not participate in the negotiation of the reorganization plan or participate

in the confirmation hearings other than to offer comments at their conclusion, would not

be subject to the same defenses as the *Haskell* plaintiffs.

---

[3] Hayes' petition for certiorari to the Supreme Court is based on the Third Circuit's failure to do its judicial duty which is to decide the equitable mootness and constitutional issues.

[4] The Bankruptcy Court did, however, express "grave doubts" whether distributions to the Senior Lenders in excess of their claims could be returned to the bankruptcy estate and reallocated to the unsecured creditor and equity classes as argued by Hayes.  The court was obviously not aware of the Third Circuit decision in *In re Zenith Electronics Corp.*, 329 F. 3d 338 347 (2003) denying the application of equitable mootness in suit to recover excess compensation for the estate.

### B. Genesis' Factual and Legal Conclusion That Insolvency Is The Primary Issue In The Appointment of An Equity Committee Is Based On A Distorted Analysis

Genesis argues that a post-confirmation equity committee should not be appointed because the Bankruptcy Court's opinion on confirmation found that Genesis was *"insolvent and that there is no possibility of a recovery for equity interests." Genesis*, 266 B.R. at 620. This conclusion however is based on a false legal and factual analysis.

In a distorted analysis of the statutory and case law, Genesis concludes that the criteria for appointing an equity committee evolved from determining whether "shareholder interests are adequately represented" to "solvency becoming the primary issue in determining whether an official committee of equity security holders should be appointed." (Genesis Brief at 12) Genesis cites dicta from *Emons*, a 1985 case stating that "generally no equity committee should be appointed where it appears that a debtor is **hopelessly insolvent**." *In Re Emons Indus., Inc.* 50 B.R. 692 694 (Bankr. S.D.N.Y. 1985) (**emphasis added**). Genesis then cites a deficiency of $625 million [5] based on valuations that the *Haskell* suit has alleged are based on fraudulent EBITDA reports to argue that the Genesis insolvency was indeed "hopeless."

Genesis' observations about the legal criteria for an equity committee evolving from a primary concern with adequate representation to a primary concern with insolvency are simply incorrect. Adequacy of representation is both a statutory and constitutional issue. And from a constitutional perspective the need for adequate representation increases as solvency decreases. Hayes' argument before the Supreme Court is that equity committees are constitutionally required due process in bankruptcy

---

[5] The Genesis derivation referenced in footnote three of their brief is unclear. The numbers presented there omit the valuation of Multicare, which ranged from $375 million to $425 million at the mid-point valuations. (*Genesis*, 266 B. R. at 616) The more appropriate deficiency determination is for Genesis on a stand alone basis, which totals $566 million as shown in the Hayes brief at 12-13.

proceedings that threaten cancellation of equity holders stock without providing

compensation.

Even the Emons case shows that in the face of "hopeless insolvency" the court's

primary concern is ensuring adequate representation for equity holders.

> The court granted the motion for the appointment in this case when
> the opposition to the motion was withdrawn because of its view that equity
> security holders in this case might wish to be active and might possibly
> have a different view on the issue of insolvency than the Institutions.

*In re Emons Industries, Inc.*, 50 B.R. at 694.

> No doubt part of the reason that the opposition to the appointment
> of an equity committee was withdrawn was recognition of the potential
> problems attendant upon a case in which there is a substantial identity
> between secured creditors, unsecured creditors and the equity holders, and
> there are public shareholders without such other positions. [6] *Id.* 693

In any event, the 1985 Emons case is at most an outlier for its holding that no

equity committee should be appointed where it appears that a debtor is "hopelessly

insolvent." In this bankruptcy district in 1996, the chief judge required the bankruptcy

court to consider six factors on a motion for an equity committee with solvency being

only one of the factors. *In the matter of Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr D.

Del.) Consequently, in order to maintain insolvency as a serious argument worthy of

this Court's consideration, Genesis would need to demonstrate other *Kalvar* factors that

when combined with insolvency justify not appointing an equity committee. [7]

---

[6] These same conflicts existed in the Genesis case where the defendant Senior Lenders in the Haskell fraud
had obtained interests in both Genesis and Multicare loans and had a huge financial incentive to promote a
reorganization plan that would combine Genesis and Multicare on terms favorable to Multcare. Genesis
equity holders and subordinated bond holders had no interests in Multicare and would see the value of their
assets decline if the exchange terms favored Multicare. *Genesis*, 266 B.R. at 619.

[7] As discussed in these prior decisions, the court will consider several factors on such a motion including:
1.   Whether the shares are widely held and publicly traded;
2.   The size and complexity of the Chapter 11 cases;
3.   The delay and additional cost that would result if the court grants the motion;

The Genesis factual analysis is equally flawed. According to Genesis the "appointment of an equity committee when a debtor is hopelessly insolvent is not permissible because the exceedingly low probability of shareholder recovery is dwarfed by the virtual certainty the creditor recoveries will be diminished by the costs of the equity committee's futile efforts." (Genesis Brief at 12) Generally the result described by Genesis occurs only for companies that declare bankruptcy because they cannot meet their current obligations. Companies like Genesis with a large cash flow (EBITDA) can meet the considerable administrative expense of bankruptcy including an equity committee, without reducing creditor recoveries.[8] In any event, after hearing these same Genesis arguments, the Bankruptcy Court did not find Genesis "hopelessly insolvent," which is the *Emons* dicta for denying equity holders a committee, in dismissing the First and Third motions. And the wisdom of having an equity committee even in the apparent face of insolvency is shown by the Haskell fraud allegations where the insolvency determinations were based on valuations relying on fraudulent EBITDA reports.

Finally Genesis argues that appointing an equity committee whose prospects for success are uncertain would be a "colossal waste of estate assets [and] [s]uch wasteful behavior should not be condoned by this Court under the guise of 'protecting' equity

---

4.   The likelihood of whether the debtors are insolvent;
5.   The timing of the motion relative to the status of the Chapter 11 cases and
6.   Other factors relevant to the relative representation issue.

*In the matter of Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr D. Del.)

No one factor is dispositive, and the amount of weight that the court should place on each factor may depend on the circumstances of the particular chapter 11 case.

[8] In fact, in large publicly held companies, appointment of an equity committee could lead to higher valuations of the reorganized enterprise because former shareholders are the most prospective investors in the reorganized enterprise, and if these investors believe they were treated fairly in bankruptcy they will reinvest in the reorganized enterprise providing higher valuations that would lead to increased recoveries for all the creditor classes.

holders who, as the Third Circuit has now held, have no remaining interest to protect."
Genesis Brief at 14. First, Genesis misstates the Third Circuit opinion which in
upholding this Court's dismissal for equitable mootness made no determination on the
underlying merits. Secondly, from a public policy perspective appointing equity
committees with low or no chances of success is not a "colossal waste of estate assets."
Investors' confidence and the basic health of the country's financial markets are
underpinned by the perception that investors will be fairly treated in bankruptcy
proceedings. These perceptions are seriously undermined when investors can clearly see
that in the Genesis bankruptcy that wealthy and powerful bankers have gained huge
windfalls in a bankruptcy process where equity holders were not represented and then
were even denied the right to appeal a clearly unjust decision. The debtors' costs of an
equity committee should be viewed no differently than the costs for reimbursing the
Senior Lenders or the costs of the Unsecured Creditors Committee as these and the other
administrative costs are all justified to ensure fairness to all constituencies. The courts
have universally recognized this public policy. For example, the first listed criteria in
*Kalvar* in appointing an equity committee is "whether the shares are widely held and
publicly traded." *In the matter of Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr D. Del.)

### C. The New Evidence Of Higher Genesis Values Contained In The Haskell Fraud Complaint Supersedes Pre-Confirmation Insolvency Arguments

More importantly, in light of the Haskell fraud on the bankruptcy court suit,
Genesis solvency arguments are no longer relevant. The Haskell complaint contained
ten specific allegations of accounting fraud that reduced Genesis' EBITDA by a $123
million. Treated as an annualized number and using the same valuation parameters as the
Senior Lenders' financial advisor, these allegations imply a reduction in Genesis

11

enterprise value in excess of a billion dollars! In addition, the Haskell complaint alleges that an another $200 million in value was improperly transferred from the Genesis estate to the Multicare estate. (Hayes Brief at 9-13) The $1.2 billion total is about twice the $625 million deficiency calculated by Genesis leaving a error margin of more than $625 million. (Please see n. 4, p.8.)

Genesis ignores these estimates with the duplicitous statement that "even the bondholders do not contend that Genesis was undervalued by more than $625 million." (Genesis Brief at 14) The statement is duplicitous because the focus of the bondholder complaint were the ten specific allegations where Genesis management allegedly manipulated the EBITDA numbers, which were provided to all the valuation experts, including the bondholders' expert. Consequently, the bondholders could not estimate new enterprise values for either Genesis or Multicare, or make more than a general assessment of damages as that would require expert valuation opinion not properly a part of the complaint. The bondholder fraud complaint thus provides no inferences on the specific undervaluation and Genesis attempt to infer a bondholder belief that the undervaluation is less than $625 million is disingenuous. Genesis attempted attribution simply misrepresents the bondholder complaint.

Genesis concludes that "the Haskell plaintiffs' discredited allegations are irrelevant to this appeal." (Id. 14) This conclusion follows from Genesis' mis-characterization of the Haskell complaint as accusing Genesis of "presenting an allegedly incorrect valuation to the Bankruptcy Court" that the Bankruptcy Court recently dismissed in its entirety. (Id. 14) In fact, however, the Haskell complaint alleged that Genesis management utilized fraudulent accounting to derive EBITDA numbers that

12

were provided to the valuation experts and this is what led to the incorrect valuations

being considered by the Bankruptcy Court at the Confirmation Hearing. Consider, for

example, the first of the ten accounting fraud allegations in the Haskell complaint:

### a. Improper Deduction from LTM EBITDA of Additions to Insurance Reserves that were Well in Excess of Potential Liability Exposure.

58. Nursing homes and pharmacies, including those operated by Genesis, carry general/professional liability ("GL/PL"), workers compensation ("W/C"), and employee health and casualty insurance. Prior to June 2000, Genesis had been self-insured for WC and had purchased GL/PL insurance from a third party carrier. On June 1, 2000, just before filing its bankruptcy petition, Genesis restructured its insurance program (which included MC) by obtaining third party W/C insurance and switching its GL/PL coverage to its own wholly owned insurance subsidiary, Liberty Health Corporation ("Liberty"), which is domiciled in Bermuda. Liberty never filed bankruptcy.

59. Liberty maintained four layers of reinsurance for this GL/PL coverage, which collectively provided "stop loss" limits to Genesis' exposure. That limit (which included claims pertaining to MC) was initially $14 million, including $9 million for its Florida elder care facilities and $5 million for its other facilities. Thus, for the twelve month period June 1, 2000-May 30, 2001, Liberty's maximum possible GL/PL exposure, for both Genesis and MC, could not exceed $14 million. For the period June 1, 2001 through May 30, 2002, this aggregate stop loss limit was raised to $19 million.

60. In this line of business "stop loss" limits are generally very high, and would never be reached absent some catastrophic liability incident. That was true for Genesis as well. For the twelve month insurance period ending May 30, 2001, Genesis (including MC) had approximately 1600 operating beds in Florida, for which, the actuarial loss experience, as determined by Genesis' risk management actuary, Tillinghast Towers-Perrin, was $2,888 per bed. For 1600 beds, the actuarial exposure was about $4.6 million, about half the $9 million stop loss limit for Genesis' Florida homes during that period. It would therefore have been appropriate to set aside reserves, and charge them against earnings, in the total amount of $4.6 million for the Florida facilities, for the period ending May 30, 2001.

61. But Genesis went far beyond posting reserves commensurate with its actual exposure. Instead, it posted reserves equal to its total stop loss limits and fully expensed those payments immediately. Between July

13

1 and August 2, 2000, Genesis (on a consolidated basis) fully funded the GL/PL self-insurance program for 2000-2001, by transferring to Liberty $14 million (in the form of letters of credit), the aggregate stop loss limit, and fully expensed that entire payment during the LTM period. Moreover, it appears that Genesis posted significant additional reserves on the insurance renewal date, June 1, 2001. During the month of June large deposits were made to Liberty and were fully expensed at the time they were made, so that they could be used to reduce LTM EBITDA. These deposits not only exceeded, on a pro rata basis, the actuarial risk, but they were also paying to cover risks that were already covered by the stop loss provisions of the reinsurance carriers.

    62. The senior creditors were well aware of these transactions and the effect they would have on the LTM EBITDA; but neither the public nor the junior creditors, including the bondholders, were informed.

    63. Normally, the payment of insurance claims and deposits to reserves ought to be comparable, leaving the total reserve balance relatively static. The great increases in insurance reserves, held by Liberty and posted by Genesis during this period, were reflected in the consolidated Genesis/MC 10Qs and 10Ks, as follows:

| Date | Reserve Balance ($ thousands) |
|---|---|
| 9/30/99 | 24,599 |
| 9/30/00 | 27,899 |
| 9/30/01 | 51,625 |
| 6/30/02 | 74,912 |

However, the last two of these figures were not disclosed until after the confirmation hearing. The rapid build-up in reserves shows that Genesis was making payments to Liberty, and expensing them, far more quickly than Liberty was paying out claims.

These data also show that the practice of over-depositing into reserve accounts, and expensing those deposits, continued post confirmation. This had the effect of keeping suspicions from arising; by depressing post-confirmation EBITDA, the trading price for Genesis stock was also kept down, rendering valueless the options that had been provided to the debenture holders in the Plan, which had an exercise price of $20.33 per share. Now that those options have expired, the excessive deposits can be returned to Genesis at any time, benefiting the defendant Genesis equity holders but not the former debenture holders.

    .   .   .

    65. Genesis did not report publicly, until the third quarter of 2002: (i) what its aggregate stop loss limits were for its GL/PL insurance, (ii)

that it had deposited reserves equal to 100 % of those limits, and (iii) that it had fully expensed all those deposits in the current period, regardless of whether those deposits exceeded Genesis' actual exposure to claims, in violation of GAAP. Genesis never reported that it had deposited, and expensed, amounts in excess of the stop loss limits.

66. Genesis has never explained the reasons for these surcharges to reserves; nor has it ever disclosed the total insurance claims it actually received during this period, so that the amount of claims could be compared to the size of the reserves being taken. Instead, Genesis management made vague, conclusory pronouncements to the unsecured creditors, in their quarterly and annual reports, and in statements to the financial wire services, to the effect that insurance costs were "spiraling upwards". These statements had the effect of explaining away the sudden tripling in insurance reserves reported by the Company within an 18 month time period.

67. Genesis was, however, telling the truth to the senior creditors. On August 8, 2000, it explained the stop loss provisions and the fact that it was funding the self-insurance deposits via a letter of credit from the DIP financing provided by the senior creditors. It also told the senior creditors that W/C costs were declining from 1999 levels, and that rates had declined slightly from 2000 to 2001. In June of 2001, Genesis management, and the senior creditors all knew that the actuarially experienced losses were $2,888 per Florida bed, and $152 per bed in all other states, an amount far lower than the amounts being reserved and expensed.

68. Plaintiffs estimate that the excessive insurance reserve charges deducted from EBIDTA, during the valuation period, were at least $13 million.

162. To effectuate their scheme, defendants made the following misrepresentations to the Court and to the unsecured creditors:

1. They misrepresented that LTM EBITDA data supplied by Genesis, for valuation purposes, had been prepared in good faith, without disclosing the accounting and financial manipulations described herein

2. They misrepresented the Budgeted EBITDA data supplied to Warberg had been prepared in good faith, without disclosing the accounting and financial manipulations described herein.

3. They gave false testimony to the bankruptcy court supporting the validity of these EBITDA data, including the testimony of George V. Hager. (*Haskell Complaint*)

Clearly, the focus of this allegation is the manipulation of Genesis' accounting for insurance reserves to reduce the EBITDA provided for valuation purposes. This is a little more serious than "presenting an allegedly incorrect valuation to the Bankruptcy Court" Changing insurance carriers shortly before filing for bankruptcy and paying allegedly inflated insurance reserves to a wholly owned subsidiary hidden from the Bankruptcy Courts more closely resembles the Enron accounting fraud. The Bankruptcy Court clearly erred in dismissing the Haskell complaint because it was the same valuation dispute considered in the bankruptcy hearings.

Genesis has been notably successful in obtaining favorable court decisions based on legal arguments premised on false, and misrepresented facts. Consider the following statements:

> Hayes neglects to inform this Court that the Bankruptcy Court recently dismissed the *Haskell* complaint in its entirety on three wholly independent grounds. Indeed, one of these grounds is equally applicable here – res judicata, because the bondholders, like Hayes, presented valuation testimony at the Confirmation Hearing and the Court rejected their valuations.

Genesis Brief at 14.

Hayes informed this court of the dismissal of the Haskell complaint on page three of his brief. Indeed it is Genesis who neglects to inform this Court that the bondholders have appealed this decision to this Court and that the legal grounds underlying the res judicata ruling will be thoroughly challenged. The finding that the Haskell complaint should be precluded because valuation is central to both the Confirmed Plan and the fraud suit mischaracterizes the nature of the fraud complaint as reflected in the claim that Genesis management manipulated its insurance reserves shown above. Such broad generalizations assume the conclusion.

16

Genesis' assertion that this Court should use the same reasoning to bar this appeal because Hayes presented valuation testimony at the Confirmation Hearing would be even more absurd if it were true. However, Genesis is once again making up facts to fit their legal arguments as Hayes did not testify at the Confirmation Hearing. He like the other shareholder objectors were only permitted to offer objections after the testimony on valuation was completed. Indeed Genesis counsel exposes their own lie and false legal argument:

> Hayes appeared at the confirmation hearing, argued his objection to the Plan and argued the First Motion. **He presented no testimony on valuation**, and his sole "evidence" on valuation was a series of derogatory cartoons depicting "Judge Judy" presiding over a proceeding in which she doled out "Judge Judy Dollars" to creditors. [9] (**Emphasis added**.)
> Genesis Brief at 2.

---

[9] One of Hayes' objections was that the valuations were the product of a corrupted process that could not be relied on by the Bankruptcy Court. As an alternative, he suggested a modified reorganization plan that would not rely on the disputed expert valuations but would let the IPO market value the new equity after Genesis was rehabilitated and filing audited financial statements. The creditors would bid on the Plan's cash, new notes and preferred stock with script in amounts equal to their allocations in the Plan. The script remaining at the IPO would be converted into new Genesis stock at the IPO offering price. Genesis equity holders would receive the remaining shares. Hayes attempted to supplement his oral explanation with a series of illustrations, which were rebuffed by the Bankruptcy Court and summarily dismissed as cartoons after Hayes repeated his request. See the attached illustrations.

MR. HAYES: Your Honor, it is difficult to see the forest through these valuations and I have an illustration prepared --

THE COURT: Sir, I don't think -- there is no further evidence being taken nor illustration.

·  ·  ·

THE COURT: They're cartoons. Anything else, sir?

MR. HAYES: I've had some illustrations that show the market valuation for Genesis could form the basis for a new plan. Please consider these ideas as a viable alternative to the flawed plan now before the Court. The appointment of a shareholder's committee would be able to assist in the formulation of a new plan based on the market value of Genesis.

Genesis App. A at 293.

It is abundantly clear that shareholders were precluded from any meaningful participation in the bankruptcy proceedings. They were denied participation through a committee and could only make individual objections at the close of the hearing after the substantive arguments had concluded. Hayes' "sole 'evidence' on valuation" was an alternative plan designed to avoid valuation as an issue.

In Summary, the Haskell fraud complaint makes ten specific allegations of manipulation of reported EBITDA that imply a Genesis undervaluation sufficient to both satisfy all the unsecured creditor deficiencies and provide a substantial recovery for shareholders. The dismissal of the Haskell complaint has no bearing on its valuation implications and the reasons for its dismissal have been appealed and have no bearing on the appointment of a post-confirmation equity committee despite Genesis arguments to the contrary.

## CONCLUSION

The arguments in the Genesis Brief that this appeal be dismissed on procedural grounds or because the Genesis Debtors are "hopelessly insolvent" are without merit.

June 13, 2005
Greensboro, North Carolina                                 Respectfully submitted,

James J. Hayes
4024 Estabrook Dr.
Annandale, Virginia 22003
(703) 941-4694

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing Appellant's Reply Brief was mailed from the

main Post Office in Greensboro, North Carolina on June 13, 2005 to Russell C.

Silberglied, Richards Layton and Finger, One Rodney Square, P. O. Box 551

Wilmington, Delaware 19899.

James J. Hayes
4024 Estabrook Dr.
Annandale, Virginia 22003
(703) 941-4694



U.S. POSTAGE
PAID
GREENSBORO CD
24011-3155
JUN 13.05
AMOUNT
$2.67
0000   19801
00099786

UNITED STATES
POSTAL SERVICE



U.S.M.S.
X-RAY

Annandale, Va 22003

Office of Clerk
United States District Court
J. Caleb Boggs Federal Building
844 N. King Street, Lockbox 18
Wilmington, DE 19801